803 So.2d 542 (2001)
Ex parte ANONYMOUS, a minor.
In the Matter of Anonymous, a minor.
1001488.
Supreme Court of Alabama.
June 1, 2001.
*543 PER CURIAM.
An unemancipated minor petitions this Court to review the judgment of the Court of Civil Appeals affirming the trial court's denial of the minor's petition for a waiver of parental consent to an abortion. We uphold the judgment of the Court of Civil Appeals and deny the petition.
Under Alabama's parental-consent statute, § 26-21-1 et seq., Ala.Code 1975, a minor may petition for a waiver of the requirement that a parent or legal guardian consent to her having an abortion. In enacting that statute and in setting forth its purpose, the Legislature expressly found that "parental consultation is usually desirable and in the best interests of the *544 minor." § 26-21-1(b), Ala.Code 1975. The minor in this case filed her petition pursuant to § 26-21-4, Ala.Code 1975, which provides, in part:
"(a) A minor who elects not to seek or does not or cannot for any reason, obtain consent from either of her parents or legal guardian, may petition, on her own behalf, the juvenile court, or the court of equal standing, in the county in which the minor resides or in the county in which the abortion is to be performed for a waiver of the consent requirement of this chapter. Notice by the court to the minor's parents, parent or legal guardian shall not be required or permitted...."
The requirement of parental consent shall be waived if the trial court hearing the minor's petition finds either:
"(1) That the minor is mature and well-informed enough to make the abortion decision on her own; or
"(2) That performance of the abortion would be in the best interest of the minor."
§ 26-21-4(f), Ala.Code 1975.
The minor filed her petition in the trial court on May 8, 2001. On May 11, 2001, following an ore tenus proceeding, at which only the minor testified, the trial court entered an order denying the minor's petition. The minor appealed to the Court of Civil Appeals, which, in an opinion dated May 21, 2001, affirmed the trial court's judgment.
The record in this case reflects that the minor is 17 years old. At the time of the hearing on her petition, she was eight weeks pregnant. She is a senior in high school, a straight-A student, and very involved in extracurricular activities. She plans to attend college in the fall, and she has been awarded two college scholarships. She has a part-time job and she puts her earnings from that job in a savings account to be used for college. The minor testified that the baby's father is 18 years old and that he also plans to attend college in the fall. She testified that he supports her decision to have the abortion.
The minor testified that her parents would react poorly to the news of her pregnancy. She stated that she had discussed the subject of abortion with her parents only when at church services and that her parents "really did not say much" about abortion but that they were "against it pretty much." She also stated that her parents had never discussed with her what their reactions might be if she were to become pregnant. She stated that she did not have a close relationship with her parents; however, she also testified that her mother was so happy she cried when the minor was chosen as a member of the majorette squad at the college she plans to attend in the fall.
The minor testified that she had talked to nurses at Planned Parenthood and at two medical clinics that perform the abortion procedure; she also said she had spoken to a "lady" at a local health department. The minor stated that she had also consulted a family friend who was in her late 30s and that friend's sister-in-law, who had had an abortion.
The minor testified that she had been made aware of alternatives to having an abortion, including rearing the child herself, placing the child for adoption, or living at a "maternity house," a residential setting in which she could reside during her pregnancy and for up to 30 days after she gave birth. The "maternity house" would arrange for the child to be placed in foster care until such time as she could assume responsibility for the child. The minor testified that when she was investigating her options, she had asked the personnel at the medical clinic at which she *545 planned to have the abortion to allow her to speak to a physician; although she was told she would be able to speak to a physician, the clinic later refused to allow her to do so. The minor testified that two other medical facilities had also refused to allow her to speak to a physician about the abortion procedure. The record does not indicate why those medical facilities denied the minor's request to speak to a physician. The minor testified that she rejected the alternatives to abortion because she wanted to attend college in the fall and she wanted to participate in the college majorette squad.
The minor's testimony included a brief description of the abortion procedure; she stated that she would be placed under local anesthesia during the procedure and that the fetus would be removed by vacuum extraction. She testified that she had been informed of the risks of the procedure, which, she said, included infection, bleeding, possible sterility, and even in some cases death. She stated that she understood she would receive counseling immediately before the procedure, and that counseling also would be available at any time after the procedure. She testified that she would do whatever was necessary if she had any complications from the procedure, including confiding in her parents.
At the conclusion of the minor's testimony, the trial judge expressed her concerns about the minor's maturity and about whether the minor was sufficiently well-informed about the abortion procedure, in view of the fact that she had not been allowed to speak to a physician, particularly because the facility she had chosen to perform the abortion had reneged on its assurance that she could speak to a physician before the procedure. The trial judge noted: "Most of us don't even have a root canal without talking with a dentist first about what's involved." (R. 23.)
In her written order denying the minor's petition for a waiver of parental consent, the trial judge included the following findings and conclusions:
"Petitioner has been denied the opportunity to engage in pre-op counseling with the physician, evaluate the physician or interview and question the physician. Likewise the physician hasn't evaluated petitioner or furnished information to petitioner[,] so the court finds the petitioner is not mature or well-informed and that abortion at this time under the proposed circumstances is contra to her best interests. The proposed provider refused to let petitioner even speak to physician after earlier saying she could."
(C. 4.)
In Matter of Anonymous, 618 So.2d 718 (Ala.Civ.App.1993), a minor had petitioned for a judicial waiver of the parental-consent requirement. The trial court denied her petition, and the Court of Civil Appeals affirmed, stating:
"The judgment of the trial court under the facts here should be accorded the presumption of correctness accorded all judgments and findings of trial court[s] that have heard evidence ore tenus. A trial judge who has seen the minor and heard her testimony is in the best position to make determinations regarding her maturity."
618 So.2d at 720. This Court, after granting the petition for review of the decision of the Court of Civil Appeals, reversed that court's judgment and rendered a judgment granting the waiver. Ex parte Anonymous, 618 So.2d 722 (Ala.1993). The Court concluded that because the only testimony was the undisputed testimony of the minor, the ore tenus rule did not apply.[1] *546 618 So.2d at 725. Justice Maddox dissented, stating that the correct standard of review was the standard applied by the Court of Civil Appeals. We agree, and we hereby overrule Ex parte Anonymous, 618 So.2d 722 (Ala.1993).
The ore tenus rule provides that a trial court's findings of fact based on oral testimony "have the effect of a jury's verdict," and that "[a] judgment, grounded on such findings, is accorded, on appeal, a presumption of correctness which will not be disturbed unless plainly erroneous or manifestly unjust." Noland Co. v. Southern Dev. Co., 445 So.2d 266, 268 (Ala.1984). "The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses." Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986). As a corollary, the ore tenus rule has no application where the facts are indisputably established and the only question is whether the trial court correctly applied the law to those undisputed facts. See Rogers Found. Repair, Inc. v. Powell, 748 So.2d 869, 871 (Ala. 1999).
As the per curiam opinion of the Court of Civil Appeals notes, § 26-21-4, Ala. Code 1975, clearly contemplates that the trial court will conduct a hearing at which the minor testifies, after which the trial court is to issue specific factual findings and legal conclusions. That hearing is to be transcribed. See 26-21-4(g), Ala.Code 1975. The nature of a proceeding for obtaining a waiver of parental consent for an abortion will almost always preclude the appearance of any adverse party, because any party adverse to the proceeding will be unaware of the proceeding and will, therefore, be unrepresented. See § 26-21-4(a), Ala.Code 1975. Therefore, as in this case, the record will contain only the testimony of the minor petitioner as adduced by her counsel, and the testimony of other witnesses called by the petitioner to support the petition; neither the minor petitioner nor the witnesses will have been subjected to cross-examination. Thus, there will seldom be contradicting testimony in the record.
We find that in a case where a minor seeks a waiver of parental consent for an abortion and no adverse party cross-examines her or otherwise challenges her testimony, a rule compelling acceptance of undisputed live testimony as truewithout affording any deference to the trial court's ability to observe and assess the demeanor of the witnessis unsound. In such a casewhere the trial court has had the opportunity to observe the witness and where assessments of the level of the minor's maturity are crucial the trial court's findings should be afforded considerable deference. Here, the trial judge had the responsibility of determining the facts. In particular, it was the trial judge's responsibility to determine whether the petitioner is mature enough and well-informed enough about the abortion procedure to make an independent decision whether to undergo an abortion without parental consent. See § 26-21-4(f), Ala.Code 1975. In addition to hearing the testimony, the trial judge could observe the minor and could consider her demeanor as she testified. That aspect of the evidence is denied an appellate court by a cold record. The trial judge was in a far better position than are we to determine, as a matter of fact, the minor's maturity and level of knowledge. The Legislature *547 has mandated that a decision to grant or to deny a waiver of the requirement of parental consent is to rest upon an evaluation of the minor's maturity and level of knowledge. We conclude that because the decision must be based upon facts gleaned from the testimony best evaluated by the trial court, the ore tenus rule should apply.[2]
When applying the ore tenus standard of review, we will reverse a trial court's judgment only when that judgment is "plainly erroneous or manifestly unjust." Noland, supra. The trial judge in this case expressed her concerns about the minor's maturity and about whether the minor was sufficiently informed about the abortion procedure, especially because the minor had not been able to speak to a physician as she had tried to do. The trial judge had the advantage of observing the minor and was therefore in the best position to assess her maturity. This Court, having only the transcript of the hearing before it, does not have the trial judge's advantage. The minor's testimony did not convince the trial judge that the minor was mature enough to make the decision to undergo an abortion. Based on the record before us, we cannot conclude that the trial court's judgment is "plainly erroneous or manifestly unjust." Accordingly, we deny the petition.
PETITION DENIED.
MOORE, C.J., and SEE, LYONS, BROWN, and STUART, JJ., concur specially.
JOHNSTONE, HARWOOD, and WOODALL, JJ., dissent.
MOORE, Chief Justice (concurring specially).
This case involves the proper interpretation of § 26-21-4 et seq. and the appropriate deference that appellate courts should give a trial court. Certain Justices on this Court have accused the majority of judicial activism because those of us in the majority believe that this Court should defer to the trial judge's factual findings because of the judge's better vantage point. Judicial activism occurs when a judge or a court departs from the Constitution and fundamental law and begins making law instead of interpreting the law. The fact that one judge disagrees with another judge does not justify an accusation of judicial activism. With this writing, I intend to expose some real judicial activism.
In 1965, the United States Supreme Court invalidated a Connecticut law that banned the purchase of contraceptives by married couples, holding that such a law inherently violates an individual's "right of privacy." Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The Griswold Court found this right of privacy, not in the explicit provisions of the U.S. Constitution, but rather "in penumbras, formed by emanations from" certain guarantees contained in the Bill of Rights. Griswold, 381 U.S. at 484, 85 S.Ct. 1678.[3]
Less than a decade later, undeterred by the absence of any express constitutional "right of privacy," the Supreme Court extended this innovative right to create a new constitutionally protected fundamental *548 right, i.e., the right of a woman to abort her unborn child. Roe v. Wade, 410 U.S. 113, 164, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). This Court "found" this new right to be commensurate with the commonly understood fundamental rights of citizens to engage in free speech (Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)), freely exercise their religion (Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)), vote (Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)), andfor parents raise their children free from excessive governmental intrusion (Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)).
Then, with little regard for the historical context of traditional legislative oversight of such activities,[4] the Court declared essentially all antiabortion statutes nationwide violative of the Fourteenth Amendment's Due Process Clause. In so doing, the Court either downplayed or dismissed history where it opposed Roe's conclusions. It further accepted certain questionably relevant or strained historical interpretations in its obvious manipulations to dismiss, among other historical authorities, the Hippocratic Oath, which is most specific in its condemnation of abortion.[5] This same Court, which two years earlier had exhibited great lenity for those convicted of murder and rape by striking down the death penalty, thus held that unborn children are not "persons" for purposes of the Fourteenth Amendment. Roe, 410 U.S. at 132, 93 S.Ct. 705.[6]
Moreover, the Court's reasoning is most troubling because similar logic and argument had before been used to sanction another great injustice. In what is perhaps the nation's most notorious legal case, the United States Supreme Court erroneously held in Scott v. Sandford, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1856) ("the Dred Scott Decision"), that slaves were not "citizens" under the Constitution. That Court stated: "The only matter in issue before the court, therefore, is, whether the descendants of such slaves, when they shall be emancipated, or who are born of parents who had become free before their birth, are citizens of a State, in the sense in which the word citizen is used in the Constitution of the United States." Scott v. Sandford, 60 U.S. (19 How.) at 403. The Court improvidently answered, "We think they are not, and that they are not included, and were not intended to be included, under the word `citizens' in the Constitution, and can therefore claim none of the rights and privileges which that instrument provides for and secures to citizens of the United States." Scott v. Sandford, 60 U.S. (19 How.) at 404-05. This ruling was patently incorrect, and many citizens of this Country still suffer *549 the legacy of such a poorly reasoned United States Supreme Court opinion.
In a dissent in the case presently before this Court, one of my learned colleagues commends the Judges on the Court of Civil Appeals who dissented in their case, In the Matter of Anonymous, 803 So.2d 529 (Ala.Civ.App.2001), "for their faithfulness to conservative principles of strict construction and stare decisis." 803 So.2d at 568 (Johnstone, J., dissenting). I understand that Justices and judges sometimes disagree; however, I do not think an accusation of unfaithfulness to conservative principles and to stare decisis, which the above statement implies, is warranted; certainly, such an accusation should not be leveled at the Justices joining in the majority opinion. In fact, I believe the majority opinions of this Court, and of the Court of Civil Appeals, are based on conservative principles, e.g., that appellate courts should give deference to the findings of the trial court. The majority opinion in this case, as well as the writings by the majority of the Court of Civil Appeals, express that principle extremely well.
In a dissent to the Court of Civil Appeals majority opinion, Presiding Judge Yates accuses the trial court and the majority of that court of "blatant judicial activism," presumably for the courts' perceived failure to follow Ex parte Anonymous, 618 So.2d 722 (Ala.1993). However, the problem with that past precedent, which the dissent by Justice Johnstone urges us to follow, is that it makes such a rare exception to well-established precedent, i.e., the ore tenus presumption. In fact, this Court's prior holding in Ex parte Anonymous, 618 So.2d 722 (Ala. 1993), is such an anomaly within the caselaw of this State that it almost precludes us from reviewing a case involving waiver of parental consent for a minor to procure an abortion.[7]
*550 Contrary to the dissenting opinions, it is the courts' expansion of the right of privacy that has been perhaps the most prominent example of judicial activism in this country's history. Beginning with the dissent in Roe, Justice White called Roe "an exercise of raw judicial power" and stated that he could find "nothing in the language or history of the Constitution to support the Court's judgment. The Court simply fashions and announces a new constitutional right for pregnant mothers." Roe, 410 U.S. at 221-22, 93 S.Ct. 705. Was Justice White's view unsupported? Numerous scholars, indeed too numerous to recite here, have repeatedly agreed with Justice White, criticizing both the "right of privacy" Griswold found "in penumbras, formed by emanations" and Roe.
"Perhaps the height of Douglas's success in bench activism came in 1965. In Griswold v. Connecticut, he conjured up a constitutional privacy right from the penumbra of various constitutional amendments, then persuaded a majority of his fellow Justices that they saw it too. Encouraged by the success of such judicial politicking, Douglas had taken to slamming federal administrators directly from the bench."
Peter Manus, The Blackbird Whistling the Silence Just After: Evaluating the Environmental Legacy of Justice Blackmun, 85 Iowa L.Rev. 429, 436-37 (2000). "As a constitutional theory, the `penumbra' is a suspect creation...." 11 Fordham Intell. Prop. Media & Ent. L.J. 97 (2000). "Roe v. Wade and its sequels can be criticized for thwarting democracy...." Schwarzschild, Pluralism, Conversation, and Judicial Restraint, 95 Nw. U.L.Rev. 961 (Spring 2001). Roe is wrong "because it is bad constitutional law, or rather because it is not constitutional law and gives almost no sense of an obligation to try to be." John Hart Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale L.J. 920, 947 (1973). "[C]ritics of all persuasions had been unable to discover a rational basis" for Roe. William Eaton, Who Killed the Constitution: The Judges v. The Law 93 (1988).
"Consider next what most lawyers and citizenseven its many criticswould deem the most prominent judicial landmark of the modern, post-Brown, post-Warren Court era: Roe v. Wade. The opinion of the Court in Roe is often viewed as notably unconcerned about constitutional text. Substantive due process? The very phrase teeters on the edge of textual self-contradiction. Indeed, in perhaps the most famous passage in the entire opinion, Justice Blackmun seems almost uninterested in the precise textual location of the abortion right he announces. Whether the right of privacy `be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment[ ]' is not particularly important to him. What is important, Blackmun says, `is that wherever this privacy right is grounded, it is broad enough to encompass a woman's decision whether or not to terminate her pregnancy.' And here is another striking fact about Roe: although Justice Blackmun quotes extensively from a great many sourcesthe Hippocratic Oath, various reports and pronouncements of the American Medical Association, the standards adopted by the American Public Health Association, utterances of the American Bar Association, *551 and much morehe never actually gets around to quoting the precise operative words of Section 1 of the Fourteenth Amendment."
Akhil Reed Amar, Intratextualism, 112 Harv. L.Rev. 747, 773-74 (1999)(footnotes omitted).
In this case, the dissenters tout as conservative jurisprudence what is actually an example of some of the most egregious judicial activism. The culmination of this argument is their accusation that anyone who does not agree with their jurisprudence is somehow not following conservative principles. In other words, you cannot be a judicial conservative unless you agree with our judicial activism. If you oppose their judicial activism, you are not embracing a conservative view of the law, you are imposing judicial activism.
Do the dissenters think Alabama trial judges are so untrustworthy that the appellate courts need to meddle with their decisions in parental consent cases more than other kinds? And upon what evidence of statutory instruction would the dissenters base such a view? Common knowledge? Common knowledge of the thinking of trial judges elected to uphold the laws of this State and the Constitution of Alabama? How is such an opinion an example of conservative judicial thought? Why does this kind of a case require more meddling than any other type of case in which a trial judge may or may not have a bias that would cause the judge to do everything in his or her power to oppose a certain result. Why the excessive interest by the dissenters in this kind of case? When I see in earlier decisions by this Court and the Court of Civil Appeals an almost knee-jerk reflex tending to allow parental-consent waivers in spite of specific determinations by the trial court to the contrary, I must ask why the trial courts' rulings on such matters are continually supplanted. In addition, this Court has so watered down the definition of "maturity" that a minor walking into a court to seek a waiver is presumed mature.[8] This is, I believe, cause for concern.
This Court today takes an important step toward correcting an error in its precedent. The opinion is not an example of judicial activism. Rather it is a long overdue correction of a grasp for power by the appellate courts of this State. I concur with the majority opinion.
In 1993, Justice Scalia, writing for the Supreme Court stated:
"Justice O'CONNOR asserts that `[w]hen the Court changes its mind, the law changes with it.' That concept is quite foreign to the American legal and constitutional tradition. It would have struck John Marshall as an extraordinary assertion of raw power. The conception of the judicial role that he possessed, and that was shared by succeeding generations of American judges until very recent times, took it to be `the province and duty of the judicial department to say what the law is,'not what the law shall be. That original and enduring American perception of the judicial role sprang not from the philosophy of Nietzsche but from the jurisprudence of Blackstone, which viewed retroactivity as an inherent characteristic of the judicial power, a power `not delegated to pronounce a new law, but to maintain and expound the old one.' Even when a `former determination is most evidently contrary to reason ... [or] contrary to the divine *552 law,' a judge overruling that decision would `not pretend to make a new law, but to vindicate the old one from misrepresentation.' `For if it be found that the former decision is manifestly absurd or unjust, it is declared, not that such a sentence was bad law, but that it was not law.'"
Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 106-07, 113 S.Ct. 2510, 2523, 125 L.Ed.2d 74 (1993) (citations omitted).
From Roe to the present, controversies have raged regarding both the legitimacy and scope of the right to abortion. However, the particular issue presented for our review in this case is whether the trial court's decision should be reversed.
Our Legislature has specifically found:
"(1) [I]mmature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences, (2) the medical, emotional and psychological consequences of abortion are serious and can be lasting, particularly when the patient is immature, (3) the capacity to become pregnant and the capacity for mature judgment concerning the wisdom of an abortion are not necessarily related, (4) parents ordinarily possess information essential to a physician's exercise of his best medical judgment concerning the child, and (5) parents who are aware that their minor daughter has had an abortion may better insure that she receives adequate medical attention after her abortion. The legislature further finds that parental consultation is usually desirable and in the best interests of the minor.
§ 26-21-1(b), Ala.Code, 1975. Moreover, by enacting this statute, the Legislature sought to "protect[ ] minors from their own immaturity, ... foster[ ] the family structure ..., and ... protect[ ] the rights of parents." Id. These goals and findings are clearly supported by the United States Supreme Court. Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979).
"In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), we emphasized the importance of the role of the attending physician. Those cases involved adult women presumably capable of selecting and obtaining a competent physician. In this case, however, we are concerned only with minors who, according to the record, may range in age from children of 12 years to 17-year-old teenagers. Even the latter are less likely than adults to know or be able to recognize ethical, qualified physicians, or to have the means to engage such professionals. Many minors who bypass their parents probably will resort to an abortion clinic, without being able to distinguish the competent and ethical from those that are incompetent or unethical."
Bellotti, 443 U.S. at 641 n. 21, 99 S.Ct. 3035. The trial court's concern regarding the clinic's refusal to allow the minor to consult with a physician is, I believe, a legitimate one. In my opinion, to say that a clinic's refusal to allow physician consultation should be of no concern to the trial court is perplexing.
The dissenting opinions mistakenly allege that the majority has inserted an additional requirement into the statute physician consultation. We have not, and the statutes speak for themselves.
The dissenting opinions further state that there is nothing in our existing law that would "put this minor on notice that she would need to introduce ... proof" related to "[her] understanding of the `emotional and psychological aspects of undergoing an abortion.'" 803 So.2d at 568 *553 (Johnstone, J., dissenting). Again, I cannot agree. The Legislature specifically found that "the medical, emotional and psychological consequences of abortion are serious and can be lasting." § 26-21-1(b)(2), Ala.Code 1975. To suggest that this finding was insufficient to alert the minor and her trial counsel that this issue may be raised at trial is unsound.
Another dissent concludes that our decision today will not only overturn precedent in the area of parental consent, but will also "arguably overrule, or seriously call into question, [our] approach to the application of the ore tenus rule taken in [other general] cases." 803 So.2d at 568-69 (Harwood, J., dissenting). I have reviewed the cases cited therein, and I find that each one is distinguishable from this case. See Rogers Found. Repair, Inc. v. Powell, 748 So.2d 869 (Ala.1999); Harris v. McKenzie, 703 So.2d 309 (Ala.1997); State v. Hill, 690 So.2d 1201 (Ala.1996); Beavers v. County of Walker, 645 So.2d 1365 (Ala.1994); Craig Constr. Co. v. Hendrix, 568 So.2d 752 (Ala.1990); Sasser v. Spartan Foods Sys., Inc., 452 So.2d 475 (Ala.1984); Stiles v. Brown, 380 So.2d 792 (Ala.1980); Security Ins. Co. v. Smith, 360 So.2d 280 (Ala.1978). In each of these cases, the facts were not disputed. As Judge Murdock perceptively indicated in his special concurrence to the Court of Civil Appeals' majority opinion, "`[t]estimony' and `facts' are two different things. Witnesses give testimony; courts find facts." Judge Murdock continued.
"In a proceeding in which the trial court has been charged with the responsibility of deriving facts without the aid of an adversarial process, the absence of an adversary to expressly concede a fact to which the minor testifies (or even tacitly concede a fact by not presenting testimony to the contrary) cannot make the witness's testimony `undisputed' in the conventional sense that justifies removing the trial court's inherent and traditional role of evaluating witnesses and their demeanor and credibility."
803 So.2d at 536 (Murdock, J., concurring specially).
The dissenting opinions would relegate the trial court to the status of court reporter. If a minor walked in off the street and presented conclusory statements that she was sufficiently mature and well-informed and that it was in her best interest to undergo an abortion, her testimony would be undisputed. Do the dissenting opinions advocate that under such circumstances, because her testimony is undisputed, the trial court must grant the abortion? This specifically contradicts the statutory language that calls for the trial court to "issue written and specific factual findings." § 26-21-4(g), Ala.Code, 1975.
As the United States Supreme Court has stated, "an abortion may not be the best choice for the minor. The circumstances in which this issue arises will vary widely." Bellotti, 443 U.S. at 642, 99 S.Ct. 3035. That Court further stated:
"Not only is it difficult to define, let alone determine, maturity, but also the fact that a minor may be very much an adult in some respects does not mean that his or her need and opportunity for growth under parental guidance and discipline have ended. As discussed in the text, however, the peculiar nature of the abortion decision requires the opportunity for case-by-case evaluations of the maturity of pregnant minors."
Bellotti, 443 U.S. at 644, 99 S.Ct. 3035. Trial courts are uniquely, and better, situated to make such determinations. Because the record shows that the trial court's ruling is not plainly or palpably wrong, the trial court's decision is due to be affirmed.
*554 Nothing in this opinion should be construed to imply that I concur with the holding in Roe. However, it is unnecessary in this opinion to address a woman's right to abortion. My sole intent is to affirm that the ore tenus rule should not be discarded for one particular genre of cases. It is the duty of this Court to uphold the judgment of the trial court unless in making that judgment, the trial court clearly abused its discretion; I do not find that to be the case here.
SEE, Justice (concurring specially).
I concur with the main opinion. I was not a member of this Court when Ex parte Anonymous, 618 So.2d 722 (Ala.1993), was decided; had I been, I would have joined Justice Maddox's dissent. For the reasons stated in the main opinion, I agree that the ore tenus standard applies to appellate review of a trial court's ruling on a petition for waiver of parental consent for an abortion. While I "accord `due regard to the principle of stare decisis,'" I nonetheless also believe that "it is ... this Court's duty `to overrule prior decisions when we are convinced beyond ... doubt that such decisions were wrong when decided.'" Ex parte State Farm Fire & Cas. Co., 764 So.2d 543, 546 (Ala.2000) (quoting Beasley v. Bozeman, 294 Ala. 288, 291, 315 So.2d 570, 572 (1975) (Jones, J., concurring specially)). I am "convinced beyond doubt" that Ex parte Anonymous was wrongly decided; therefore, I concur in overruling it.
I also agree with the main opinion that, if the ore tenus standard of review is applied, the trial court's judgment is due to be affirmed. In reaching that conclusion, I am not unmindful of the following comment by the trial court judge: "This is a beautiful young girl with a bright future and she does not need to have a butcher get a hold of her." I recognize that this statement could suggest a personal bias against abortion, as Presiding Judge Yates, below, suggests,[9] but the fact that a judge may have personal views against abortion does not give rise to a presumption that she is unable to apply the law to the facts of the case.[10] As the United States Court of Appeals for the District of Columbia has stated, "It is well established that the mere fact that a judge holds views on law or policy relevant to the decision of a case does not disqualify him from hearing the case." Southern Pac. Communications Co. v. American Tel. & Tel. Co., 740 F.2d 980, 990 (D.C.Cir.1984). Indeed, all judges are at times called upon to decide cases in accordance with policies with which they disagree,[11] and judges often *555 express their disagreement with the policy or law they are enforcing.[12] To cause a judge's disqualification, a personal view on a policy affecting a case "`must be of a character calculated to impair seriously his impartiality and sway his judgment, and must be strong enough to overthrow the presumption of his integrity.'" Duncan v. Sherrill, 341 So.2d 946, 947 (Ala. 1977), quoting 48 C.J.S. Judges § 82b.
If a party believes a judge is biased, the party can move for the judge's recusal; in that event, the moving party has the burden of presenting evidence proving bias. See Henderson v. G & G Corp., 582 So.2d 529, 529 (Ala.1991) ("We further note that there is a presumption that a judge is qualified and unbiased, and that one alleging to the contrary has a substantial burden of proof.").
In the absence of any additional evidence that would tend to call the trial judge's finding in this case into question, I cannot conclude that this statement by the trial court judge is a sufficient basis for a conclusion that she made her decision on any basis other than those required by statute and by her oath of office.
I concur.
LYONS, Justice (concurring specially).
The trial court was acting pursuant to § 26-21-4, Ala.Code 1975; by enacting that statute the Legislature created a procedure for obtaining a judicial determination that the required consent of a minor's parents to a minor's abortion can be waived. The statutory waiver can be given if the court finds either:
"(1) That the minor is mature and well-informed enough to make the abortion decision on her own; or
"(2) That performance of the abortion would be in the best interest of the minor."
§ 26-21-4(f).
The trial court concluded that the petitioner's lack of preoperative counseling with a physician, her lack of any opportunity to evaluate the physician or to interview and question the physician, and the fact that she had not been evaluated by a physician justified the finding that "the petitioner is not mature or well-informed and that abortion at this time under the proposed circumstances is contra to her best interests."
*556 I initially concluded, as did a majority of the Court of Civil Appeals, that the rule of Ex parte Anonymous, 618 So.2d 722 (Ala. 1993), rejecting the ore tenus standard of review in such cases, did not apply. However, the problem is not just that this record is incomplete; the trial court based its findings, after hearing all of the evidence, including the live testimony of the petitioner, on the failure of the petitioner to have contact with a physician. There is no indication in the record that the petitioner requested the assistance of the court in arranging a consultation with a physician. While the trial court did not detail what useful information might have resulted had such a consultation taken place, her conclusion leads one to review the record for areas indicating that the petitioner was inadequately informed as to the abortion procedure. I cannot overlook the absence of any basis in this record from which to conclude that the minor was aware of any of the potential long-term psychological or emotional effects of having an abortion. This concern is not driven by personal convictions, but by force of statute. In § 26-21-1(b)(2), the Legislature "finds as a fact" that "the medical, emotional and psychological consequences of abortion are serious and can be lasting, particularly when the patient is immature."
I agree with the majority opinion that the trial judge, after observing the witness and weighing the evidence, is in a better position than are we to draw conclusions as to the statutorily mandated criteria for granting a waiver of parental consent. I note the observations in the per curiam opinion of the Court of Civil Appeals to the effect that it would make no sense for the Legislature to require a hearing before a judge during which a transcript of the proceedings must be recorded, followed by specific factual findings and conclusions, if the judge's role was essentially that of a court reporter, with no authority to make any determinations as to the credibility of the witness. See Matter of Anonymous, 803 So.2d 529, 534 (Ala.Civ.App.2001).
Cases such as this come to us with extremely constricted deadlines. Under these circumstances, it is especially useful to look to other jurisdictions for guidance. An Ohio appellate court recently addressed the standard of review for the trial court's determinations in cases involving waivers of parental consent to a minor's abortion. See In re Jane Doe 01-01, 141 Ohio App.3d 20, 749 N.E.2d 807 (2001), where the Ohio Court of Appeals observed:
"The standard of review of appeals from juvenile court orders dismissing a complaint filed under [Revised Code] 2151.85 is well-settled: `Absent an abuse of discretion by the juvenile court, the dismissal of a complaint brought by an unemancipated pregnant minor seeking authorization to have an abortion pursuant to R.C. 2151.85 shall not be disturbed.' In Re Jane Doe 1 (1991), 57 Ohio St.3d 135, 566 N.E.2d 1181, syllabus.
"Appellant testified that she is seventeen years old. She has made the honor roll on each of her last two report cards and is involved in several extracurricular activities. She also works approximately twenty hours per week. She has applied to college to study criminal justice and plans to become a criminal lawyer. A representative of the Juvenile Court Diagnostic Clinic (see In Re Jane Doe 97-2 [May 20, 1997], Cuyahoga App. No. 72545, unreported, n. 2, at 3) interviewed applicant and testified that appellant `is able to present herself in a mature way, and I do believe that she has given much thought to her situation.' Appellant argues, therefore, that the record substantiates her claim that she *557 is `sufficiently mature and well enough informed' to be entitled to relief under R.C. 2151.85.
"The trial court was not, however, convinced that appellant was sufficiently mature and well enough informed. The trial court `was left in doubt by complainant's demeanor and testimony as to whether she truly understood [the abortion procedure and her options].' Journal Entry, January 11, 2001. Specifically, the trial court observed that appellant contacted an abortion provider within hours of taking a home pregnancy test. Additionally, the trial court expressed concern regarding appellant's credibility because she testified that she was `planning to get on birth control' despite indicating that she would not continue to be sexually active.
"In Doe 1, supra, the appellant was seventeen years old, a senior in high school, active in sports, planning to attend college and worked twenty to twenty-five hours per week. 57 Ohio St.3d 135, 144, 566 N.E.2d 1181. The Doe 1 court affirmed the judgment of the court of appeals affirming the judgment of the trial court that appellant did not prove the claims in her complaint by clear and convincing evidence.
"While the correctness of a juvenile court's dismissal of a complaint brought under R.C. 2151.85 must be scrutinized on a case-by-case basis, a reviewing court must evaluate the trial court's determination under an abuse of discretion standard. As this court has defined this standard, `[t]he term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. * * *' State v. Adams (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149. [* * *9] See, also, Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140.
"When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. Berk v. Matthews (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301, 1308.

"Above all, a reviewing court should be guided by a presumption that the findings of a trial court are correct, since the trial judge `* * * is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. * * *' Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276.
". . . .
"The trial court did indeed consider appellant's demeanor and weigh her credibility. The trial court concluded: `Complainant's decision to seek an abortion appears to result from panic rather than well-reasoned and careful decision making. Even though complainant does well academically in school and has plans to attend college, she failed to convince this Court that she truly understood the full impact of having an abortion.' Journal Entry, January 11, 2001. In light of the controlling standard of appellate review, we cannot conclude that the trial court abused its discretion by holding that appellant failed to demonstrate by clear and convincing evidence that she was sufficiently mature and well enough informed to intelligently decide whether to have an abortion without notification of her parent."
141 Ohio App.3d at 22-23, 749 N.E.2d at 808-09 (emphasis added).
The approach advocated by the Ohio Court of Appeals allows the trial court to have a role in the proceeding beyond *558 merely a presiding officer at the taking of testimony. I was not a member of this Court when Ex parte Anonymous, 618 So.2d 722 (Ala.1993) was decided. I believe the holding in that case impermissibly contradicts the will of the people as expressed in Amendment No. 328, § 6.01, which reposes judicial power in judges of this state. Precedent that reduces judges to administrative officers in such nonadversarial proceedings cannot withstand constitutional scrutiny, and I share the majority's view that that case should now be overruled. Adherence to the rule of Ex parte Anonymous, supra, on the basis that stare decisis requires it would effectively allow an erroneous opinion to amend the Alabama Constitution. I do not believe fidelity to conservative principles includes slavish adherence to precedent that conflicts with our Constitution. I authored the opinion in Ex parte Cranman, 792 So.2d 392 (Ala.2000). That opinion stated:
"We cannot, in blind obedience to the doctrine of stare decisis, continue to accept an expansive application of caselaw characterizing as a discretionary function conduct remote from the execution of governmental policy; to do so would perpetuate an erroneous construction of the Constitution. Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 42 (Ala. 1998) (Lyons, J., concurring specially) (citing Gwin, White & Prince, Inc. v. Henneford, 305 U.S. 434, 454-55, 59 S.Ct. 325, 83 L.Ed. 272 (1939) (Black, J., dissenting))."
792 So.2d at 404-05. However, adoption of standards to guide the trial court in its difficult determinations in these cases would quell concerns that a minor could never successfully challenge a result that was "plainly erroneous or manifestly unjust." To prevent such a challenge would frustrate the clearly expressed legislative purpose of creating an alternative for minors who elect not to obtain parental consent.
The Supreme Court of Texas recently grappled with this troublesome area of the law. See In re Jane Doe, 19 S.W.3d 249 (Tex.2000) ("Doe I"). In Doe I, that court announced criteria to aid the trial court in making determinations as to maturity and the knowledge of the minor. The Texas Supreme Court held:
"We conclude that a trial court should take into account the totality of circumstances the minor presents in determining whether she is mature and sufficiently well informed. In order to establish that she is sufficiently well informed, the minor must make, at a minimum, three showings.

"First, she must show that she has obtained information from a health-care provider about the health risks associated with an abortion and that she understands those risks. That would include an understanding of the risks associated with the particular stage of the minor's pregnancy.

"Second, she must show that she understands the alternatives to abortion and their implications. As with any medical procedure, part of making an informed decision is knowing the available alternatives. A minor should be able to demonstrate that she has given thoughtful consideration to her alternatives, including adoption and keeping the child. She should also understand that the law requires the father to assist in the financial support of the child. See Tex. Fam.Code § 154.001; see also Tex. Const. art. XVI, § 28 (garnishment of wages for court-ordered child support payments). She should not be required to justify why she prefers abortion above other options, only that she is fully apprised of her options.

*559 "Third, she must show that she is also aware of the emotional and psychological aspects of undergoing an abortion, which can be significant if not severe for some women. She must also show that she has considered how this decision might affect her family relations. Although the minor need not obtain this information from licensed, professional counselors, she must show that she has received information about these risks from reliable and informed sources, so that she is aware of and has considered these aspects of the abortion procedure."
19 S.W.3d at 256-57 (emphasis added).
Speaking to the role of the trial court, the Texas Court observed:
"A determination of maturity necessarily involves more trial court discretion. However, if a court determines that a minor has not demonstrated that she is mature enough to make a decision to undergo an abortion, then the court should make specific findings concerning its determination so that there can be meaningful review on appeal. Similarly, if a court concludes that a minor is not credible in some respect that directly relates to its determination of maturity, the court should make specific findings in that regard as well.
"A minor who can show that she is sufficiently well informed may also establish in the process that she is mature. In making a determination of maturity, there are, however, some criteria that should not be relied upon as conclusively showing immaturity. The United States Supreme Court has said that one of those is the fact, standing alone, that the pregnant female is a minor. That Court has also admonished that states and courts `may not make a blanket determination that all minors ... are too immature to make this decision or that an abortion never may be in the minor's best interests without parental approval.' [City of Akron v. Akron Center for Reproductive Health, Inc.,] 462 U.S. [416,] 440, 103 S.Ct. 2481, 76 L.Ed.2d 687 [(1983)]. A child's age, educational background or grades in school, while indicative of some level of maturity, are not conclusive on the issue of maturity. Nor is participation in extra-curricular activities. It should also go without saying that a minor's socio-economic status should not bear on the decision."
19 S.W.3d at 257 (original emphasis omitted; emphasis added).
The Texas Supreme Court then remanded the case for further proceedings in light of this newly announced standard. The trial court once again found that abortion was not in the best interest of the minor. On subsequent appeal, the Texas Supreme Court reversed the trial court's judgment. See In re Jane Doe, 19 S.W.3d 346 (Tex. 2000) ("Doe II"), where the Texas Court stated that Doe had satisfied the requirement, drawn from Doe I, 19 S.W.3d at 256, that she be "aware of the emotional and psychological aspects of undergoing an abortion." The Texas Court held in Doe II:
"Doe spoke to an older relative and another minor about their abortion decisions and how they felt about them. After this, Doe discussed the emotional effects of abortion with the organization's counselor, who also gave Doe written materials about the emotional consequences of abortion. Doe read these materials several times. Although she did not discuss the emotional consequences of abortion with anyone opposed to abortion, she was not required to do so. See [Doe I, 19 S.W.3d] at 257.
Doe testified that, after consulting these sources, she understood that many women experience guilt after an abortion *560 and some women experience depression, but that abortion also provided many women with a feeling of relief. Doe did not merely consider these emotional consequences in the abstract; she carefully considered how each of these alternatives would affect her emotionally. She reasoned that all of her choices would involve guilt, but that she felt most comfortable with the decision to have an abortion.
"Doe also indicated that she understood the gravity of her decision. She considered how abortion would affect her emotionally in light of its serious consequences. Doe asked to see the fetus on the ultrasound video, testifying that she considered it her responsibility to do so. Doe also testified that she understood and considered the fetus's development. Doe understood that her decision to terminate her pregnancy was irrevocable, and consequently recognized the seriousness of her decision. She also considered an abortion's effects on her spiritual well-being and concluded, based on her personal spiritual beliefs, that it would not have an adverse effect."
19 S.W.3d at 361.
This record is devoid of any evidence regarding the minor's understanding or acknowledgment of the emotional and psychological aspects of undergoing an abortion. I cannot fault the trial court for concluding that the absence of dialogue between the petitioner and a physician in light of the evidence before the court justified her finding a lack of maturity or sufficient information and for concluding further that an abortion "at this time under the proposed circumstances is contra to [the minor's] best interests."
BROWN and STUART, JJ., concur.
BROWN, Justice (concurring specially).
I concur with the majority opinion. I also concur with Justice Lyons's observation in his special concurrence that there is no basis in the record from which to conclude that the minor was aware of any of the potential long-term psychological or emotional effects of having an abortion.
STUART, Justice (concurring specially).
I concur with the majority opinion in this case. Additionally, I join Justice Lyons's special concurrence, in which he discusses the role of the trial court and the factors the trial court should consider in determining (1) whether a minor is mature and well-informed enough to make an intelligent decision whether to undergo an abortion without notifying her parent or (2) if she is not, whether the performance of the abortion would be in the minor's best interest.
JOHNSTONE, Justice (dissenting).
I respectfully dissent from the decision to affirm the judgment of the Court of Civil Appeals affirming the judgment of the trial court denying relief to this minor petitioner. I first will present my analysis of the case in terms of the application of the existing law to the facts of record. I then will address some of the rationales of the Justices who are voting to affirm.
The minor filed a petition for a waiver of parental consent to an abortion. After taking the testimony of the minor, the trial court denied her petition by a written order. The entire rationale of the trial court in the written order reads:
"Petitioner has been denied the opportunity to engage in pre-op counseling with the physician, evaluate the physician or interview and question the physician. Likewise the physician hasn't evaluated petitioner or furnished information to petitioner so the court finds *561 the petitioner is not mature or well-informed and that abortion at this time under the proposed circumstances is contra to her best interests. The proposed provider refused to let petitioner even speak to physician after earlier saying she could." (Emphasis added.)
The entire rationale of the trial court spoken at the hearing reads:
"The Court: Okay. All right. Well, I think that should give you cause for pause and concern. It certainly gives the Court cause for pause and concern if a healthcare provider has said that a young lady could speak with a physician and then reneges on that, I would have concern for her well-being.
"And I have concerns about her maturity under this crisis situation. She might make decisions that she wouldn't ordinarily make. So, you may step down, sweetie.
"I do not find that under these circumstances that abortion would be in her best interest. I would find that it is absolutely in her best interest to see the physician, talk with the physician, ask questions. And she has been not only not allowed to see the physician, but has been told she could not speak with the physician prior.
"I think it creates a set of circumstances whereby a young girl is cowed and if for some reason she doesn't have a good feeling about a doctor, she might not have the get up and go to walk out of the situation. I think that it is very suspect that a medical provider would tell you one thing and then turn around and tell another.
"I believe that these procedures cost enough money that they ought to have pre-counseling with these girls and tell them about this. Most of us don't even have a root canal without talking with a dentist first about what's involved. And I don't believe that this is right. I don't believe it's wise. I don't believe she's mature and I know she's not well informed enough.
"And I don't think that under these circumstances that it would be in her best interest to go to a facility that has told her one thing and then gone against their word. It is extremely suspect. And I deny it.
"[Minor's attorney]: Your Honor, for the record we would like to state that we felt that
"The Court: Well, now I don't think it would be appropriate for counsel to comment on the Court's ruling. I think you made that comment and I gave my ruling. I think that's theI don't think that we need to say any more. That would put me in a position of perhaps rebutting.
"Let me just say, I'm very concerned about this young lady's welfare. Like counsel, I'm a mother. And, you know, a doctor even tells a child that a shot is going to be a little sting, it's going to hurt a little bit. You know, these people are interested in one thing it appears to me and that is getting this young lady's money. And I know there are other providers that can talk with these young girls.
"This is a beautiful young girl with a bright future and she does not need to have a butcher get a hold of her. She's scared and she's nervous and she needs the helping hand of a seasoned, dedicated professional that doesn't mind giving ten or fifteen minutes of their time. Thank you. We're adjourned." (R. 22-25.)
The record is devoid of evidence that would establish that the medical provider would butcher the petitioner.
*562 The undisputed facts are presented by the testimony of the petitioner, the only evidence introduced at the hearing. Details that would tend to identify the minor are generalized in brackets or omitted by ellipses.
"Q. How old are you?
"A. I'm seventeen.
". . . .
"Q. What grade are you in?
"A. I'm a senior.
"Q. What kind of grades do you make?
"A. I'm a straight A student.
"Q. Are you involved in any clubs or activities?
"A. Yes. I'm [a] senior class [officer].... I'm in our math club which you have to have an overall A average to be in there. And I'm a member of the [high school service] club which helps out with community services and stuff. Then student council which we clean up around our school. I'm a member of the band. I'm also a majorette....
"Q. Well, that will do for now. Did you recently get amake a special club of some sort?
"A. Recently, I made [a majorette] at [a prominent university]. So, I'll be a majorette there this 2001 year.
". . . .
"Q. And you're planning to graduate high school?
"A. Yes, ma'am.
"Q. Are you employed right now?
"A. I work ... part time.
"Q. What do you do with your earnings?
"A. Well, I'm saving them up for college.... I have a savings account. [Every paycheck goes into it.]
"Q. Where do you plan to go to college and where?
"A. [A prominent university].
"Q. All right. And how are you going to pay for your education?
"A. [A relative] is paying for my tuition. And I got scholarships [totaling several thousand dollars.] ... And the rest of it my parents are going to pay.
"Q. What do you plan to study when you get there?
"A. I'm studying [a preparatory curriculum to be a medical provider at one prominent university] for two years. Then I'm going to [take the professional curriculum for that profession for four years at another prominent university].
"Q. What do you plan to be in the future?
"A. A [professional medical provider].
". . . .
"Q. Why did you go for pregnancy testing?
"A. Because I had skipped a period and I usually don't.
". . . .
"Q. Is [your boyfriend] supportive of you and your decision?
"A. Yes.
". . . .
"Q. How did you decide to go with the judicial bypass action rather than ask your parents?
"A. Because I don't really have a close relationship with my parents and I've never really trusted either of them. So, I never can talk to them about anything.
"Q. So, you decided to do this instead?
"A. Uh-huh (in the affirmative).
"Q. Have you discussed abortion with any other adults?
"A. Yes. I've called the doctor's office at [a women's clinic]. I've also talked to a nurse there. I've talked to a lady from the Planned Parenthood. I talked to a lady at the health department.... *563 I've talked to another nurse from [another women's clinic].... And all the nurses that I talked to.
"Q. Have you talked to anyone outside of the medical profession as well?
"A. Yes. I've talked to a friend of ours whoshe had a sister-in-law to go through it, but yet she had it at the doctor's office. But it still was the same exact procedure. I talked to her about it. I also talked to a neutral source.
"Q. How old were those last two people?
"A. One of them was late thirties. And I don't know the nurses at the health department.
"Q. All right. Have you been informed about abortion and alternatives to abortion by a neutral source?
"A. Yes, I have. I called the Alabama Planned Parenthood and they gave me many different options that I could choose.
"Q. Other than Planned Parenthood, who else have you talked to?
"A. I talked to the healthcare center.... They also gave me different options that I could talk to.
"Q. What were the options as described to you?
"A. They said that they have a maternity house now that rooms ten and they're also building another one. You can stay at the maternity house until you have your baby and then you can stay there up to thirty days after you have the baby.
"They said you could give it up to foster care and give it to a foster family or if you know a family that would take care of it up until you're able to take care of it yourself then theyyou know, the papers and everything. You would go to court and you would be able to have it then.
"Then they went through the adoption process and then also abortion.
"Q. And did they talk to you about keeping the child for yourself as well?
"A. Yes. They said that I could go straight through delivery.
"Q. And after hearing about these, did youwhat decision did you make?
"A. I would want to have an abortion. I don't feel like I could handle it any other way. I've got a very steady career towardscoming towards me. I got college and school and everything to think about. I'm also [a majorette]. They don't want somebody out there with a baby because they choose by physical appearance, I think.
"Q. What's the status of your physical health?
"A. Excellent.... I work out for at least forty-five minutes a day. I walk for twenty minutes a day. I also [engage in extracurricular exercise] at least an hour a day.
". . . .
"Q. Where do you plan to have the abortion procedure performed and when?
"A. At [a women's clinic] and hopefully tomorrow.
". . . .
"Q. How are you going to pay for the procedure?
"A. My boyfriend is going to pay for it.
"Q. Have you discussed what is involved in the procedure with a medical professional?
"A. Yes, I have. The nurse that works at [a women's clinic]. She was the only one I could talk to. I called there. And I also called [another women's clinic] and also the Planned Parenthood. And none of them would let me talk to the *564 doctors that actually do the surgery because
"Q. Let's slow that down. You have talked to medical professionals, correct?
"A. Yes.
"Q. You said you spoke to a nurse at [a women's clinic]?
"A. Yes.
"Q. Are there any other nurses that you spoke to?
"A. I spoke to one at [another women's clinic].
"Q. Did you go through the procedure with them?
"A. I did, their procedure. But I also did the one at [a third women's clinic] and they both appeared to be the same.
"Q. And did you ask anyone else about their procedures and how they did the abortion procedure?
"A. Well, most of theI really can't talk to the doctor doctor. But the nurse thatthey said that the nurse or a counselor can go in there with you while you're having the abortion. And they'll give you like coaching and stuff on it.
"Q. Did you call any other places to talk to nurses or go visit any other places to talk with the nurses?
"A. No.
"Q. As far as doctors are concerned, did you talk with the doctor?
"A. No.
"Q. Did you attempt to talk to a doctor?
"A. Yes.
". . . .
"Q. Tell the Court what you understand to be involved in the abortion surgical procedure?
"A. I understand they have a local anesthetic which they'll give you anesthesia. They also have this oral medication that you can take. When you take that, it numbs the bottom half of your body. And they would go in with an aspirator which is like a vacuum or sucking machine. And they go in there around the uterus wall and they just suck it out. That's what they told me.
"Q. Do you understand that there are risks to this procedure?
"A. Yes, I do.
"Q. What would those risks be?
"A. You could have an infection if you don't take care of yourself afterwards. Sterilization if the instruments they use are not properly cleaned. You could have bleeding because you bleed after you've had the abortion. You have bleeding internally and externally. You could havewhat was the other one they told medeath, the main one, I guess. But they said that's always a factor.
". . . .
"Q. Are you emotionally and mentally prepared to go through with an abortion?
"A. I feel like I am. I've been strongminded about all of this.
"Q. Do you feel an abortion is in your best interest?
"A. I do." (R. 4-21.)
"The only testimony in this case was by the minor petitioner; therefore, the testimony in this case is undisputed. When the facts are undisputed, the ore tenus rule has no application. The role of the appellate court is, therefore, to determine whether the trial court `misapplied the law to the undisputed facts.' Matter of Anonymous, 515 So.2d 1254, 1256 (Ala.Civ.App. 1987) (emphasis in original)." Ex parte Anonymous, 618 So.2d 722, 725 (Ala.1993). See also Ex parte Anonymous, 664 So.2d 882, 884 (Ala.1995).
*565 Section 26-21-4, Ala.Code 1975, provides in pertinent part:
"(a) A minor who elects not to seek or does not ... obtain consent from either of her parents or legal guardian, may petition, on her own behalf ... for a waiver of the consent requirement of this chapter....
". . . .
"(d) The petition ... shall include...:
". . . .
"(3) A statement that the petitioner wishes to have an abortion without the consent of either parent or legal guardian.
"(4) An allegation ...
"a. That the petitioner is sufficiently mature and well enough informed to intelligently decide whether to have an abortion without the consent of either of her parents or legal guardian.
". . . .
"(f) The required consent shall be waived if the court finds either:

"(1) That the minor is mature and well-informed enough to make the abortion decision on her own; or

"(2) That performance of the abortion would be in the best interest of the minor.
"(g) A court that conducts proceedings under this section shall issue written and specific factual findings and legal conclusions supporting its decision...." (Emphasis added.)
A minor's exercise of her statutory right to elect not to seek parental consent to obtain an abortion does not raise any inference adverse to her petition. See § 26-21-4; see also Ex parte Anonymous, 618 So.2d at 724-25:
"The minor has elected to pursue an abortion without the consent of her parents, and a waiver of consent is in no way contingent on her proving that her parents would disapprove or abuse her should they be consulted regarding her decision to obtain an abortion. In fact, the reaction of the minor's parents is of little consequence as long as she can demonstrate to the court that she is mature enough and well enough informed to make the decision on her own or that an abortion is in her best interest."
"[I]n order to deny a minor a waiver of her parents' consent to obtain an abortion, the court must specifically find two things: that the minor is not mature enough and well enough informed to make the abortion decision, and that the performance of the abortion is not in the best interest of the minor." Ex parte Anonymous, 595 So.2d 499, 500 (Ala.1992). A minor's "voluntary decision to resort to the judicial procedure, specifically requesting the advice of legal counsel, may, of itself, indicate maturity." Ex parte Anonymous, 595 So.2d 497, 499 (Ala.1992) (citation omitted). This case is analogous to Ex parte Anonymous, 664 So.2d 882 (Ala.1995):
"Viewing the record with that standard in mind, we find from the undisputed evidence that the minor is mature and well enough informed to make the abortion decision on her own. Her voluntary decision to resort to the judicial process, specifically requesting the advice of legal counsel, may, of itself indicate maturity. Ex parte Anonymous, 595 So.2d 497 (Ala.1992). In addition, her considering a number of options, as well as her soliciting information and advice from a number of sources, including the father, the boyfriend, demonstrates maturity. Ex parte Anonymous, 595 So.2d 497 (Ala.1992). In view of these facts, we conclude that the judgment denying the minor's petition for a *566 waiver of parental consent is fatally flawed. Therefore, having found that the minor met her burden of proof as to the first prong of § 26-21-4(f), we need not address the second prong, i.e., best interest.

"However, we do note that it is not the court's responsibility to superimpose its judgment or its moral conviction on the minor in regard to what course of action she should take with reference to her own body. It is not a question of whether she is making a decision that we approve of, but whether she is making a mature decision. See Ex parte Anonymous, 618 So.2d 722 (Ala.1993)."
664 So.2d at 884 (emphasis added).
Section 26-21-4(g) requires that the trial court "issue written and specific factual findings and legal conclusions supporting its decision." The written order issued by the trial judge in this case in compliance with this statutory requirement reveals that her sole ground for her finding that "the petitioner is not mature or well-informed" is that the physician who would perform the abortion has not evaluated or counseled the petitioner and the petitioner has not interviewed and questioned the physician. The statute does not require direct interaction between the physician and the petitioner before the petitioner is due her relief. The trial court has, in effect, erroneously added this requirement to the statute.
This petitioner has proved an impressive degree of maturity through her evidence of academic and extra-curricular achievement, civic service, economic responsibility, and career planning as well as her evidence of her investigation and pursuit of her options to her recent pregnancy. She has also proved that she is sufficiently well-informed through her evidence of her consideration of options other than abortion, her solicitation of information and advice from a number of sources, including the boy-friend-father, a family friend in her 30s, the family friend's sister-in-law who has had an abortion, various women's health-care facilities, and Planned Parenthood. Indeed, this petitioner's proof that she is "mature and well-informed enough to make the abortion decision on her own," § 26-21-4(f)(1), meets or exceeds the quality and quantity of proof found sufficient in most of our precedents for granting the relief she seeks. See e.g., Ex parte Anonymous, 664 So.2d 882 (Ala.1995); Ex parte Anonymous, 618 So.2d 722 (Ala.1993); Ex parte Anonymous, 595 So.2d 499 (Ala. 1992); Ex parte Anonymous, 595 So.2d 497 (Ala.1992); In re Anonymous 782 So.2d 791 (Ala.Civ.App.2000); In re Anonymous, 770 So.2d 1107 (Ala.Civ.App.2000); In re Anonymous, 733 So.2d 429 (Ala.Civ. App.1999); In re Anonymous, 718 So.2d 64 (Ala.Civ.App.1998). Accordingly, the judgments of the trial court and of the Court of Civil Appeals should be reversed, and judgment in favor of the petitioner should be rendered waiving the requirements of consent to her obtaining an abortion of her current pregnancy.
The short time our rules allow us to issue our opinions in these cases means that the other Justices' respective writings may still be in a state of flux, and their respective votes, including concurrences, special concurrences, concurrences in the result, and dissents may still be in a state of flux. Thus I am not presently able to identify a particular rationale as a majority rationale or identify precisely which Justices concur in a particular rationale. This impediment explains the general way I attribute the rationales of the Justices who are voting to affirm as I analyze those rationales in the paragraphs that follow on the basis of the respective Justices' writings that have already been circulated internally among us.
*567 One rationale of one or more of the Justices who vote to affirm is essentially that the ore tenus rule sanctifies the judgment of the trial court. This rationale would require that we reject stare decisis and overrule our own precedent of Ex parte Anonymous, 618 So.2d 722 (Ala. 1993), which expressly holds that the ore tenus rule does not apply to undisputed testimony in cases like the one before us. At least one of the Justices who votes to affirm prefers to follow a brand new Ohio intermediate appellate court case on this point rather than our own well-settled precedent. Rejecting stare decisis on this point in the case now before us is particularly inappropriate in that this minor's testimony is entirely consistent internally. She did not contradict or belie herself. Her testimony did not present the trial judge with any conflict to resolve by observing the demeanor and delivery of this petitioner-witness. This feature of the case before us distinguishes it from the Ohio case, where the minor "testified that she was `planning to get on birth control' despite indicating that she would not continue to be sexually active." In re Jane Doe 01-01, 141 Ohio App.3d 20, at 23, 749 N.E.2d 807, 809 (Ohio Ct.App.2001).
The main opinion is only technically correct in stating that, in cases of this kind "the record will contain only the [uncross-examined] testimony." 803 So.2d at 546. In this kind of case, as in virtually every kind of case, and specifically bench trial cases as this one is, the trial judge himself or herself is authorized to question the witness or witnesses to clarify or to supplement the testimony.
One Justice who votes to affirm opines that our precedent of Ex parte Anonymous, 618 So.2d 722 (Ala.1993), should be overruled on the ground that it violates "Amendment No. 328, § 6.01, [Alabama Constitution of 1901], which reposes judicial power in judges of this state." His rationale seems to be that the holding of this precedent foreclosing the ore tenus rule and adopting de novo review of the judgment of the trial court "reduces judges administrative officers." If this unique rationale were correct, and I submit that it is not, then the same section of the Alabama Constitution would be violated by the statutory provision for the de novo appellate review of death sentences, based as they are on the often disputed testimony of witnesses testifying live before the jury and the judge. See § 13A-5-53(b)(2), Ala.Code 1975 ("Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence" (emphasis added)). Our precedent of Ex parte Anonymous, 618 So.2d 722 (Ala.1993), is at least equally as constitutional, fair, and wise. It has been followed at least seven times by this Court and the Court of Civil Appeals. It has all the value recognized by the doctrine of stare decisis. This time, though, it seems to be in the way.
Rejecting our own precedent and applying the ore tenus rule in these waiver-of-parental-consent-requirement cases would virtually nullify all of our other precedents, already cited in this dissent, holding what proof is objectively sufficient to require relief regardless of the trial judge's subjective impression. The ultimate effect of adopting the ore tenus rule in these cases would be to doom minor petitioners to the arbitrary judgments of those trial judges who are predetermined to stop all abortions and to use any means for this purpose even in violation of constitutional and statutory law.
The implied premise of another rationale of one or more of the Justices who vote to affirm is that the trial judge based her denial of relief on the absence of evidence *568 in the record regarding "the emotional and psychological aspects of undergoing an abortion." The first problem with this premise is that it is factually mistaken. This dissent of mine quotes the entirety of the trial judge's written and spoken reasons for denying relief. These reasons do not mention a word about the absence of evidence regarding "the emotional and psychological aspects of undergoing an abortion." I invite the reader to search the trial judge's written and spoken reasons, quoted at the beginning of this dissent. Such a search will demonstrate that, even if the record contained express and conclusive proof that this minor thoroughly understood the "emotional and psychological aspects of undergoing an abortion," such proof would not contradict or avoid a single one of the litany of illegitimate reasons the trial judge spoke and wrote for denying relief. The trial judge's reasons are wholly independent of any requirement of proof specifically that this minor understand "the emotional and psychological aspects of undergoing an abortion."
Neither our statute nor any of our precedents, as distinguished from the Texas case cited by one Justice who votes to affirm, requires proof on the topic of the minor's understanding of "the emotional and psychological aspects of undergoing an abortion." Therefore our existing law did not put this minor on notice that she would need to introduce such proof. Moreover, in all truth, the speculative "emotional and psychological aspects of undergoing an abortion" pale in comparison to the obvious and certain calamity that bearing a baby will wreak on this minor's life and on the life of virtually every other young woman similarly situated. Thus a specific requirement for such proof would unbalance the balance of our law even considered by an impartial trial judge. To a trial judge predetermined to thwart abortions, such an additional requirement would present one more opportunity to find the proof wanting and to deny the relief.
The result of the decision of the majority in this case produces a patent absurdity. This minor has been found so uninformed and immature that she may be forced to bear a baby.
The notion that the decisions of the trial court and the appellate courts in this case protect this minor's own best interests mocks reality. Unless she finds some other way to terminate this pregnancy, the judgments of our courts will most likely damage her life permanently.
Finally, I agree with the dissents of Presiding Judge Yates and Judge Crawley written in opposition to the main opinion issued by the Court of Civil Appeals in this case. I commend them for their faithfulness to conservative principles of strict construction and stare decisis.
HARWOOD, Justice (dissenting).
The lead opinion in this case expressly overrules Ex parte Anonymous, 618 So.2d 722 (Ala.1993). According to my survey of the body of caselaw that has developed in this area, the following cases, which each applied the ore tenus rule in the same manner as did Ex parte Anonymous, would also be overruled, sub silentio. Ex parte Anonymous, 664 So.2d 882 (Ala. 1995); Ex parte Anonymous, 771 So.2d 1043 (Ala.Civ.App.2000); Ex parte Anonymous, 660 So.2d 1022 (Ala.Civ.App.1995); Ex parte Anonymous, 650 So.2d 923 (Ala. Civ.App.1994); and Ex parte Anonymous, 515 So.2d 1254 (Ala.Civ.App.1987). Further, despite the attempt in the lead opinion to focus on the unique procedural posture in a trial court of a case concerning a waiver of parental consent to abortion, the rationale given in that opinion for overruling Ex parte Anonymous, 618 So.2d 722 (Ala.1993), would also arguably overrule, *569 or seriously call into question, the approach to the application of the ore tenus rule taken in such factually unrelated cases as Rogers Foundation Repair, Inc. v. Powell, 748 So.2d 869 (Ala.1999); Harris v. McKenzie, 703 So.2d 309 (Ala.1997); State v. Hill, 690 So.2d 1201 (Ala.1996); Beavers v. County of Walker, 645 So.2d 1365 (Ala.1994); Craig Construction Co. v. Hendrix, 568 So.2d 752 (Ala.1990); Sasser v. Spartan Foods Systems, Inc., 452 So.2d 475 (Ala.1984); Stiles v. Brown, 380 So.2d 792 (Ala.1980); and Security Insurance Co. v. Smith, 360 So.2d 280 (Ala.1978).
I cannot agree with the wholesale overruling of the cases listed above; therefore, I must dissent from the rationale expressed in the lead opinion. Because that rationale is essential to the result reached by that opinion, I necessarily dissent.
WOODALL, Justice (dissenting).
I respectfully dissent. The trial court's judgment is erroneous under any standard of review, including the ore tenus standard. By denying this petition, the majority has allowed the trial court to deny the petition for the sole reason that the minor, despite her best efforts, has not been able to consult with a physician. However, as Judge Crawley stated in his dissent:
"Alabama caselaw has never indicated that consultation with a physician is the sine qua non of being well-informed. Ala.Code 1975, § 26-21-1 et seq., states no requirement that, to show her maturity, a minor must consult a physician before deciding to have an abortion. The trial court, by engrafting the requirement that the minor consult a physician before deciding to have an abortion, went beyond the requirements of the statute and the caselaw interpreting it."
Matter of Anonymous, 803 So.2d 529, 542 (Ala.Civ.App.2001). The majority has apparently forgotten that "the ore tenus rule does not extend to cloak a trial judge's conclusions of law, or incorrect application of law to the facts, with a presumption of correctness." Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala.1999).
I am disappointed by today's decision, and echo the thoughts expressed by Presiding Judge Yates in her dissent to the Court of Civil Appeals opinion:
"The trial court's judgment and the main opinion of this court are contrary to the law of Alabama and that of the United States Supreme Court, and represent blatant judicial activism. There is absolutely no requirement under Alabama law that the minor have a prepetition physician consultation by telephone or otherwise before obtaining a waiver of parental consent. Any attempt by this court to require such a consultation is not within the authority of this court as set out in the Alabama Constitution. Therefore, I dissent."
803 So.2d at 540 (emphasis supplied).
NOTES
[1] We noted:

"The only testimony in this case was by the minor petitioner; therefore, the testimony in this case is undisputed. When the facts are undisputed, the ore tenus rule has no application."
618 So.2d at 725.
[2] The dissenting opinion of Justice Harwood expresses unfounded concern over the effect of this holding on cases arising in the separate and distinct context of adversarial proceedings.
[3] Justice Stewart, dissenting in Griswold, could not find this right of privacy "in the Bill of Rights, in any other part of the Constitution, or in any case ever before decided by this Court." Griswold, 381 U.S. at 530, 85 S.Ct. 1678.
[4] In his dissent in Roe, Justice Rehnquist relied on the fact that, upon enactment of the Fourteenth Amendment, 36 states had laws limiting or prohibiting abortion as evidence that abortion is not a "fundamental" right because it had always been subject to legislative oversight and regulation. Roe, 410 U.S. at 174-75, 93 S.Ct. 705 (Rehnquist, J., dissenting).
[5] "`I will give no deadly medicine to anyone if asked, nor suggest any such counsel; and in like manner I will not give to a woman a pessary to produce abortion,' or `I will neither give a deadly drug to anybody if asked for it, nor will I make a suggestion to this effect. Similarly, I will not give to a woman an abortive remedy.'" Roe, 410 U.S. at 131, 93 S.Ct. 705 (footnotes omitted).
[6] Corporations are "persons" within the meaning of the Fourteenth Amendment. Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985).
[7] I have found three cases in which the Court of Civil Appeals affirmed a trial court's denial of a request by a minor for a waiver, the remaining cases were reversed. This Court has twice affirmed a denial. In the Matter of Anonymous, 782 So.2d 791 (Ala.Civ.App. 2000); In the Matter of Anonymous, 770 So.2d 1107 (Ala.Civ.App.2000); In the Matter of Anonymous, 771 So.2d 1043 (Ala.Civ.App. 2000); In the Matter of Anonymous, 733 So.2d 429 (Ala.Civ.App.1999); In the Matter of Anonymous, 720 So.2d 497 (Ala.Civ.App. 1998); In the Matter of Anonymous, 718 So.2d 64 (Ala.Civ.App.1998); In the Matter of Anonymous, 711 So.2d 475 (Ala.Civ.App. 1998); In the Matter of Anonymous, 684 So.2d 1337 (Ala.Civ.App.1996); In the Matter of Anonymous, 678 So.2d 783 (Ala.Civ.App. 1996); In the Matter of Anonymous, 674 So.2d 1317 (Ala.Civ.App.1995); Ex parte Anonymous, 664 So.2d 882 (Ala.1995) (reversed the judgment of the Court of Civil Appeals, which had upheld the trial court's denial of a request for a waiver); In the Matter of Anonymous, 660 So.2d 1022 (Ala. Civ.App.1995); In the Matter of Anonymous, 655 So.2d 1052 (Ala.Civ.App.1995); In the Matter of Anonymous, 650 So.2d 923 (Ala.Civ. App.1994); In the Matter of Anonymous, 650 So.2d 919 (Ala.Civ.App.1994) (affirmed the trial court's denial of a request for a waiver); In the Matter of Anonymous, 628 So.2d 854 (Ala.Civ.App.1993); Ex parte Anonymous, 618 So.2d 722 (Ala.1993) (this Court reversed the judgment of the Court of Civil Appeals, which had affirmed the trial court's denial of a request for a waiver); In the Matter of Anonymous, 618 So.2d 718 (Ala.Civ.App.1993); Ex parte Anonymous, 597 So.2d 711 (Ala.1992) (this Court affirmed the denial of a waiver by the trial court); In the Matter of Anonymous, 597 So.2d 225 (Ala.Civ.App.1992); In the Matter of Anonymous, 597 So.2d 709 (Ala.Civ. App.1992); In the Matter of Anonymous, 597 So.2d 224 (Ala.Civ.App.1992); In the Matter of Anonymous, 597 So.2d 708 (Ala.Civ.App. 1992) (the Court of Civil Appeals affirmed the trial court's denial of a waiver); Ex parte Anonymous, 595 So.2d 497 (Ala.1992) (this Court remanded the case to the trial court after the Court of Civil Appeals affirmed a denial by the trial court); In the Matter of Anonymous, 549 So.2d 1347 (Ala.Civ.App. 1989); Ex parte Anonymous, 531 So.2d 901 (Ala.1988) (this Court remanded the case for determination of whether an abortion was in the minor's best interests); In the Matter of Anonymous, 531 So.2d 895 (Ala.Civ.App. 1988) (the Court of Civil Appeals held that parental-consent statute was unconstitutional as to minors in custody of DHR).
[8] "Her voluntary decision to resort to the judicial procedure, specifically requesting the advice of legal counsel, may, of itself, indicate maturity." Ex parte Anonymous, 595 So.2d 497, 499 (Ala.1992).
[9] Presiding Judge Yates stated:

"Finally, I write to add that although the main opinion repeatedly refers to remarks made by the trial court, it omits what I believe to be a very telling statement that could be construed to show a strong bias, rather than `concern for the minor's safety and best interests.' The judge stated, `You know, these people are interested in one thing it appears to me and that is getting this young lady's money.' It went on to state, `This is a beautiful young girl with a bright future and she does not need to have a butcher get ahold of her.'
"The trial court's judgment and the main opinion of this court are contrary to the law of Alabama and that of the United States Supreme Court, and represent blatant judicial activism."
803 So.2d at 540.
[10] I am unaware of any indication in the record of a bias on the part of the judge against the petitioner herself.
[11] In Alabama, judges take the following oath upon entering office, as required by the Alabama Constitution of 1901:

"I solemnly swear that I will support the Constitution of the United States, and the Constitution of the State of Alabama, so long as I continue a citizen thereof; and that I will faithfully and honestly discharge the duties of the office upon which I am about to enter, to the best of my ability. So help me God."
Art. XVI, § 279, Ala. Const 1901. As Justice Lyons has recently written:
"The oath of judicial office requires that ... a judge apply the law, to the best of his or her ability, in a manner consistent with the will of the body that created the authority, regardless of any personal views as to the wisdom of the Legislature or the people in expressing that will."
Ex parte C.V., [Ms. 1981316, April 27, 2001] ___ So.2d ___, ___ (Ala.2001) (Lyons, J., concurring specially).
[12] See, e.g., Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 850, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage. Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision."); Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 38 (Ala.1998) (Houston, J., concurring specially) ("Although I disagree with the majority of the United States Supreme Court in its ... interpretation of the Federal Arbitration Act as it applies to state courts, a majority opinion of that Court is part of the law I have taken an oath to uphold."); Street v. State, 237 Ga. 307, 318, 227 S.E.2d 750, 758 (1976) (Gunter, J., dissenting) ("Although I disagree with the construction of the Federal Constitution as construed by seven members of the United States Supreme Court ..., I am nevertheless, as a member of the Georgia Supreme Court, bound by that construction of federal law.").