THOMPSON, Presiding Judge.
D.M. (“the mother”) and M.M. (“the father”) appeal four separate judgments finding their four children dependent and awarding custody of the children to M.E. (“the maternal grandmother”).
The matter currently under appeal was initiated in October 2008, when the maternal grandmother filed a petition in the Tuscaloosa Juvenile Court (“the juvenile court”) alleging that J.M.M. was dependent and seeking an award of custody of that child. In her petition, the maternal grandmother alleged that the father and the mother had emotionally abused J.M.M. and that the father had physically abused him. The record indicates that, pursuant to a consent order based on an agreement between the parents and the maternal grandmother, J.M.M. began living with the maternal grandmother at approximately the same time the dependency petition was filed.
In December 2008, Carl Montgomery, in his capacity as the attendance supervisor for the Tuscaloosa City Board of Education (“the Board”), filed petitions in the juvenile court seeking to have the parents’ other three children, J.L.M., C.S.M., and M.L.M., declared dependent. Each of those petitions contained the allegation that “[the child’s] parents ... have failed to exercise their duty as parents to provide the proper care for [the child] in order to ensure her regular school attendance. [The child] has a severe ‘head lice’ infestation that prevents her from attending school regularly.” The juvenile intake officer sent letters to the Tuscaloosa Department of Human Resources (“DHR”) asking it to investigate the three dependency petitions initiated by Montgomery on behalf of the Board.
The juvenile court conducted a hearing on the dependency petitions. On January 21, 2009, the juvenile court entered separate orders finding that there existed “probable cause” that all four children were dependent and awarding pendente lite custody of the children to the maternal grandmother.[1] The parents were awarded weekly visitation with the children, but the January 21, 2009, orders specified that the visitation not be conducted in the parents’ home. In August 2009, the children’s guardian ad litem filed a motion to require that the parents’ visitation with the children be supervised, and the juvenile court granted that motion.
In September 2009, the juvenile court entered an order removing J.M.M. from the maternal grandmother’s custody and awarding pendente lite custody of him to *703 DHR. The record indicates that J.M.M. was placed in a local group home.
The juvenile court conducted an ore ten-us dependency hearing over the course of four days between October 2009 and April 2010. On August 26, 2010, it entered judgments finding the youngest three children dependent, awarding custody of the children to the maternal grandmother, and awarding the parents visitation. On that same date, the juvenile court also entered a judgment in which it purported to find J.M.M. dependent and award custody of him to DHR. The parents timely appealed each of the dependency judgments. This court, ex mero motu, consolidated the appeals.
The two oldest children, J.M.M. and J.L.M., are the biological children of the mother. The father adopted J.M.M. and J.L.M. shortly after the parties married. The father testified that he could not recall how long the parties had been married, but he stated that J.M.M. and J.L.M. were five and four years old, respectively, when he adopted them. Thus, it appears that the parents were married in approximately the mid 1990s. C.S.M. and M.L.M. were born to the parents in 1999 and 2000, respectively.
DHR began investigating the mother and the father in 2002, when it received reports of inadequate hygiene for J.M.M. and J.L.M. That investigation resulted in “indicated” findings for inadequate hygiene. In November 2002, the parents took M.L.M., who was almost two years old at the time, for medical treatment for what the DHR social worker characterized as a severe diaper rash that caused blistering burns. Photographs of the child’s condition at that time were admitted into evidence. In her testimony at the dependency hearing, the mother insisted that the blistering burns occurred within a 24-hour period and that the condition was not attributable to the parents’ failure to change the child’s diaper. Angela Baker Jones, a DHR social worker, testified that, as a result of the severe blisters to the child, DHR’s investigation into that incident resulted in an “indicated” finding; Jones did not specify whether that finding was indicated for hygiene issues or for neglect of M.L.M. At the time of the 2002 incidents, DHR arranged for a case aide to provide homemaking services, such as assisting the family with routines for bathing, washing clothes, and general housekeeping chores. Those services were provided to the family between October 2002 and April 2003, when the DHR investigation was closed.
In October 2003, DHR once again became involved with the family when J.L.M., who was then 10 years old, was shot in the arm while in the parents’ home. The mother and the father were outside in the yard of the home when that shooting occurred. The mother denied the accuracy of the police report stating that J.L.M. had been playing with the gun before it discharged. The mother also disputed a version, apparently related to DHR social workers by the children, that C.S.M. had been playing with the gun when it went off and that she had accidently shot J.L.M. Rather, the mother testified that the children had been playing inside and had inadvertently knocked the pistol from its resting place on an entertainment center; the mother stated that the pistol discharged when it landed on the floor. J.M.M. testified that the incident happened in a manner similar to that to which the mother testified. The father stated that he did not know how the incident had occurred.
Jones testified that the police report completed at the time of the October 2003 shooting incident indicated that the parents’ house was filthy. Jones stated that DHR records indicated that the children stayed with the maternal grandmother for *704 the weekend following the shooting incident so that the parents could clean the family’s home. Jones also testified that DHR’s investigation into the October 2003 shooting incident resulted in a finding of inadequate supervision of the children by the parents.
Jones testified that, in October 2004, DHR received a report alleging sexual abuse of at least one of the children by the father and physical abuse of the children by both parents; Jones stated that there was no indicated finding for abuse as to either parent as a result of the investigation into that 2004 report.
The predominant issue upon which the parties presented evidence was the family’s long history with hygiene problems, especially lice infestations. Although some of the evidence pertaining to the lice infestations is somewhat vague, it is clear that lice and hygiene problems have been a consistent issue for the family for a number of years. The mother admitted that lice had been a problem since even before DHR became involved with the family in 2002.
It is undisputed that the children were sent home from school repeatedly with lice and that often the children were not allowed to return to school because the parents had failed to properly treat and remove the lice. Montgomery, the attendance supervisor for the Board, testified that the children, had missed a great deal of school because of the problems with lice and hygiene. Montgomery explained that the first absence from school caused by a lice infestation is excused but that any subsequent absence because of lice is considered unexcused. He stated that the children had had problems with excessive absences from school for years. Although no specific attendance information was provided for each of the previous years, Montgomery testified and submitted exhibits concerning the children’s school attendance during the 2008-2009 school year. The evidence indicates that for the 2008-2009 school year, M.L.M. had 15 unexcused absences and 4 excused absences; 3 of the unexcused absences occurred after the maternal grandmother had obtained custody of her. The evidence indicates that C.S.M. had nine unexcused absences in the 2008-2009 school year and that J.L.M. had five; each child had one unexcused absence after the time the maternal grandmother gained custody of the children. In the 2009-2010 school year, M.L.M. had one unexcused absence from school, C.S.M. had one unexcused tardy, and J.L.M. had seven unexcused absences, although most of J.L.M.’s absences were for only part of the school day.
In 2005, DHR social workers documented a complaint from the children’s school that the children once again had recurrent lice. Shortly thereafter, the family moved from Tuscaloosa to Hale County. The record indicates that the family continued to have problems with lice infestations while they lived in Hale County.
In February 2008, the family returned to Tuscaloosa County. The record indicates that the children began missing school because of lice almost immediately following that move. Patricia Rice, the nurse at the school attended by the two youngest children, testified that those two children had lice within two to three weeks of returning to Tuscaloosa County. Rice also stated that, in the fall of 2008, the two youngest children had lice “if not every month, every other month.” Montgomery testified that the children had all had “excessive unexcused absences” from school in the past two school years.
We note that, in August 2008, the mother received custody of the four children of the father’s sister (hereinafter “the four cousins”). The record indicates that the *705 mother sought an award of custody of those children in a court in Walker County and that the court in Walker County awarded her custody of the four cousins over the objection of DHR.[2] The evidence indicates that the four cousins also had issues with lice while living with the family and that they had also missed school as a result.
In May 2008, the maternal grandmother moved to Tuscaloosa from Florida and began residing in a house on the same street as the mother. In August 2008, the mother and J.M.M. were involved in a physical altercation in which J.M.M. struck the mother. On October 1, 2008, the maternal grandmother filed a petition alleging that J.M.M. was dependent and seeking an award of custody of him. Based on an agreement reached by the parents and the maternal grandmother, the juvenile court, on October 22, 2008, awarded pendente lite custody of J.M.M. to the maternal grandmother until the dependency petition could be heard. On January 21, 2009, the juvenile court continued pendente lite custody of J.M.M. with the maternal grandmother, and, in response to the dependency petitions initiated by Montgomery on behalf of the Board, it entered orders awarding custody of the three youngest children to the maternal grandmother pending a dependency hearing. See note 1, supra.
The evidence indicates that J.M.M. did not miss any school because of lice after he moved to the maternal grandmother’s home. The maternal grandmother testified that, when she received custody of the three youngest children in January 2009, she immediately treated them for lice. It appears that at least two of the children missed school following that treatment, and one child was refused entry to school pending a second treatment. However, it is undisputed that, since the maternal grandmother rid the three youngest children of the lice they had when they came into her custody in January 2009, none of the children have had any further incidents of lice.
Jones and the witnesses for the Board testified that the three youngest children’s attendance rates, grades, and hygiene had improved after the children were placed in the custody of the maternal grandmother and that the behavior of two of those children had also improved. The principal at the two youngest children’s school testified that, after the children were placed with the maternal grandmother, the lice outbreaks stopped and the children missed school only for medical or legal appointments. The school principal also stated that the children appeared better groomed than when they had resided with the parents.
Barbara Martin, the nurse for the school attended by the two youngest children in 2005 and 2006, and Rice each testified that she had discussed treatment and prevention of lice with both parents during the years the children had been in the schools in which each was a nurse. The mother testified that, over the years, she had taken a number of steps to alleviate the family’s recurrent lice problem. The mother insisted that the recurrent lice problem was not the fault of the parents and that she had done all she could to treat and prevent lice. The mother alleged that the lice problem originated in the schools rather than in the family’s home.
In August 2008, apparently in response to the investigation into the confrontation between J.M.M. and the mother, DHR opened an investigation into the family’s hygiene and continued lice problems. At *706 that time, the goal was to assist the parents in maintaining the youngest three children in the home. In its January 21, 2009, orders, the juvenile court ordered the parents to complete parenting classes and to provide proof that their house was free of lice. In addition, in its January 21, 2009, orders, the juvenile court ordered each parent to complete a psychological examination. Jones testified, however, that the parents refused the services offered by DHR and that the parents instead insisted on obtaining the parenting classes and psychological examinations from providers of their own choosing. The parents completed the parenting classes in September 2009, and they obtained the psychological evaluations in October 2009, only shortly before the first day of testimony in the dependency hearing. The record contains no evidence regarding the results of those evaluations.
In December 2009, a charity performed extensive work on the family’s home. Jones testified that the charity painted the walls, finished the floors, refinished the bathroom, and added new furniture and bedding. Jones acknowledged that the condition of the parents’ home was much improved and that she doubted that lice was currently a problem in the parents’ home at the time of the February 2010 portion of the dependency hearing.
On questioning by the parents’ attorney regarding what more the parents could do to obtain the return of the children to their newly improved home, Jones testified that DHR was concerned because the parents had taken no responsibility for the continued lice problems and had consistently blamed those problems on others. Jones explained that the parents had, in the past, made temporary physical improvements in the home but that the problems with lice always resumed. Jones also expressed concern that the mother relied too heavily on J.M.M. and J.L.M., both of whom have health problems or disabilities, to provide care for the younger children.
The mother and the father each receive Social Security disability benefits. The mother stated that she is disabled because of her weight, diabetes, and asthma and that the father is disabled because he cannot read or write. Both J.M.M. and J.L.M. have health problems for which they receive Social Security disability income.[3]
The mother denied that her disabilities prevented her from properly caring for the children. However, evidence in the record, including the testimony of J.M.M., indicates that J.M.M. and J.L.M. often were the responsible for cooking and cleaning and for preparing the children (including the four cousins, when the mother had custody of them) for school. The mother insisted, however, that she did the necessary work and that J.L.M. often cooked because she wanted to learn to do so.
The parents disputed DHR’s allegation that the parents had promised the children gifts if the children returned to the parents’ home. Jones also testified J.M.M. had become romantically interested in a 12-year-old girl who was a family friend; *707 J.M.M. was 17 years old at the time. Jones was concerned that the mother had promised to allow J.M.M. to see the girl if he would attempt to return to live with the parents. According to Jones, despite the objections of DHR social workers, the maternal grandmother, and J.M.M.’s juvenile probation officer, the parents allowed and even arranged for J.M.M. to see the girl. A detailed recitation of the facts pertaining to the instances in which J.M.M. came into contact with the girl, and whether the mother had arranged or facilitated the meetings, is not necessary. Suffice it to say that the mother denied that she had arranged or facilitated J.M.M.’s contact with the girl. The mother stated that she had driven the girl to the family’s church, but not for the purpose of allowing J.M.M. and the girl to see each other. She also stated that she had not arranged for the girl to be at a mall during family visitation but that she had not prevented J.M.M. and the girl from seeing each other on that occasion. Jones testified that the children had reported that the mother had allowed J.M.M. to see the girl. The maternal grandmother testified that the younger children had reported to her that, after January 2009, J.M.M. had visited the girl at the parents’ home.
It is undisputed that, in summer 2009, J.M.M. began rebelling against the household rules imposed by the maternal grandmother. In August 2009, J.M.M. was removed from the maternal grandmother’s home because of his rebellious behavior, and he was placed in a group home. In its order effecting that transfer, the juvenile court again found that there was “probable cause” that J.M.M. was dependent, and it awarded custody of J.M.M. to DHR pending the dependency hearing.
During the dependency hearing, the parents each insisted that they had been separated and living in separate homes for the past four years. Although it is clear that the father has a house separate from that of the mother, DHR disputed that the parents actually live separately, and it instead contended that the parents claim to live separately in order to maximize the family’s Social Security disability benefits. DHR presented evidence indicating that the father’s house did not appear to be utilized and that the father spent most if not all of his time with the mother. The parents presented evidence indicating that the father lived in Hale County and often drove to Tuscaloosa to assist the mother with the children or with housework when necessary. The juvenile court did not make an explicit factual finding regarding that disputed issue, and this court does not do so.[4] The issue is pertinent to the juvenile court’s perception of the mother’s credibility and possibly to its determination of whether, if she lives separately from the father, the mother is capable of adequately caring for the children by herself.
In each of its judgments, the juvenile court found by clear and convincing evidence that the pertinent child was dependent. In addition, in each judgment, the juvenile court determined, among other things, that the “return of legal custody to the parents would be contrary to the best interests of the child due to neglect, lack of appropriate supervision, and truancy of the child.”
In their brief on appeal, the parents challenge only , the juvenile court’s judgments granting the petitions pertaining to the three youngest children. The parents *708 argue that the judgments finding the three youngest children dependent are not supported by the evidence presented by the Board.[5] They address the evidence as it pertains to the lice issue and to the children’s absences from school. The parents do not address the evidence as it pertains to J.M.M.[6] Accordingly, we affirm the judgment pertaining to J.M.M. See Black v. Allen, 587 So.2d 349, 349 (Ala.Civ.App.1991) (“When an appellant fails to argue an issue in its brief, that issue is waived and cannot be considered on appeal.”). We address the parents’ arguments on appeal as they pertain to the judgments finding the three youngest children to be dependent.
With regard to the standard this court applies in reviewing a dependency determination, this court has stated:
“A finding of dependency must be supported by clear and convincing evidence. § 12—15—65(f)[, Ala.Code 1975];[7] M.M.S. v. D.W., 735 So.2d 1230, 1233 (Ala.Civ.App.1999). However, matters of dependency are within the sound discretion of the trial court, and a trial court’s ruling on a dependency action in which evidence is presented ore tenus will not be reversed absent a showing that the ruling was plainly and palpably wrong. R.G. v. Calhoun County Dep’t of Human Res., 716 So.2d 219 (Ala.Civ.App.1998); G.C. v. G.D., 712 So.2d 1091 (Ala.Civ.App.1997); and J.M. v. State Dep’t of Human Res., 686 So.2d 1253 (Ala.Civ.App.1996).”
J.S.M. v. P.J., 902 So.2d 89, 95 (Ala.Civ.App.2004). In addition, the juvenile court is in the best position to make factual determinations; this court has explained:
“The trial court received ore tenus evidence and was in the best position to observe the child and the other witnesses while they testified and to evaluate their demeanor and credibility. Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986). Therefore, its determinations based on that evidence are entitled to a presumption of correctness on appeal and will not be reversed absent a showing that they are clearly erroneous. Ex parte Anonymous, 803 So.2d 542, 546 (Ala.2001).”
J.S.M. v. P.J., 902 So.2d at 96.
In their brief on appeal, the parents argue, as they did before the juvenile court, that the Board failed to demonstrate that they were at fault for the hygiene and lice problems and that the Board did not demonstrate what they could have done to prevent the persistent lice outbreaks. The Board, however, did present such evidence. The school nurses and Jones each had provided information in the form of instructions and written materials to the parents to enable them to treat and prevent lice. The parents, in their brief on appeal, contend that the Board “provides little guidance in deciding which products *709 are effective” for the treatment of lice. However, they have made no argument and have cited no supporting authority indicating that the Board was under a duty to recommend or provide specific products to treat or prevent further lice outbreaks within their home. Further, the maternal grandmother successfully treated the lice the children had at the time they came into her care in January 2009, and she has successfully prevented further outbreaks while the children have remained in the same schools as they attended while living with the parents.
In their brief submitted to this court, the parents also blame the schools for some of the children’s absences; they contend that the schools often sent the children home, thus contributing to the problem of the children’s excessive absences. However, the evidence was clear that the children were sent home from school only when they had lice or when the parents had failed to properly treat a lice outbreak.
The parents also contend that the Board did not demonstrate that the children’s behavior improved after custody was awarded to the maternal grandmother. The dependency petitions for the three youngest children were not based on those children’s behavior but rather on the lice problems that caused the children to miss an excessive amount of school. However, we note that the record indicates that at least two of the three youngest children have specialized needs and that the behavior of only the youngest child had not improved since she was placed in the maternal grandmother’s care.
The parents argue that the Board failed to present detailed evidence regarding the children’s absences and that it offered only vague testimony about the family’s reputation within the school system as being known for frequently having lice. However, the Board did present evidence regarding the number of days the children were absent from school during the 2008-2009 and 2009-2010 school years. The Board also presented evidence indicating that the children’s number of absences from school had been a continuation of the children’s attendance rates in the years preceding the 2008-2009 school year. The parents also point out that, although the Board’s witnesses claimed to keep records, the Board did not present evidence regarding exactly when the children had lice. Indeed, the Board’s attendance records do not state a reason for each of the children’s numerous unexcused absences, i.e., which of those absences was caused by one of the children’s having lice. We decline to impose on the Board the duty to investigate and document the reasons for a child’s unexcused absence from school. Also, given that the parents do not dispute that the children have missed a great deal of school because of their having lice, we are unable to discern how a statement of the exact dates missed for that reason would assist the trier of fact in determining the issue of dependency.
In addition to the evidence pertaining to the persistent lice problems, other evidence in the record on appeal also supports a finding of dependency. Jones testified, and J.M.M. confirmed, that the parents often left the responsibility of cooking for the family and preparing the younger children for school to J.L.M. (who was 15 at the time of the dependency hearing) and, to some extent, J.M.M. The mother disputed that evidence and stated that she did most of the household chores, but the resolution of factual disputes is a matter for the trial court.
Also, the evidence supports a conclusion that the parents supported, or at a minimum tolerated, J.M.M.’s romantic interest in a young girl. Evidence was presented indicating that DHR had concluded that the parents had been guilty of neglect and inadequate supervision of the children with *710 regard to the diaper rash on M.L.M. and the incident in which J.L.M. was shot; those events were remote in time, having occurred in 2002 and 2008. DHR did not take action to remove the children from the home after those incidents, and those incidents, by themselves, would not provide support for the current dependency finding. However, the juvenile court could consider those incidents as indicative that the parents’ neglect or inadequate supervision had continued, particularly given the evidence indicating that the older children did a great deal of the housework and the parents did not adequately supervise J.M.M.’s relationship with the young girl.
The parents also argue that the juvenile court failed to properly consider what they contend is the “significant progress” they have made in their living condition since the children were removed from their custody. The evidence indicates that a charity did extensive work to improve the parents’ home. Jones acknowledged in her testimony that she believed that the lice was probably out of the parents’ house at the time of the later dates of the dependency hearing. However, Jones testified that, in the past, the parents had made progress when DHR provided services but that the lice problem had consistently reoccurred. Jones expressed concern that the parents would again fail to sustain the condition of the home so as to prevent further lice outbreaks, particularly because the parents refuse to acknowledge that they have any responsibility for the continuing lice problems.
In this case, after considering the disputed factual evidence, the juvenile court determined that the children were dependent because of issues of neglect, lack of supervision, and truancy. We conclude that the evidence in the record on appeal supports the factual determinations that the parents’ conduct amounted to neglect and lack of supervision that resulted in the children’s excessive absences from school.[8] The evidence indicates that the children have had persistent lice problems for a period of at least eight years and that those problems have caused the children to miss a great deal of school. In addition, the record supports a conclusion that the parents placed much of the responsibility for the children’s care on the two oldest children. The record also supports a finding that the parents have allowed, if not facilitated, J.M.M.’s contact with a 12-year-old girl. After careful consideration, we also conclude that, given the facts of this case, the juvenile court properly based its dependency determination on the factual findings of neglect and inadequate supervision.
As an alternative challenge to the dependency determination, the parents argue that DHR did not meet its burden of showing that it made reasonable efforts to prevent the removal of the children from the parents’ home. Former § 12-15-65, Ala.Code 1975, required the juvenile court to consider whether DHR had made such reasonable efforts to prevent the removal of a child “from his or her home.”[9] In *711 each of its dependency judgments, the juvenile court found that “DHR made reasonable efforts to prevent the removal of the child from her parents including referrals for counseling, and in-home services offered in previous DHR involvements with the family, and a relative placement.” We note, however, that the children were not removed from their home as a result of petitions filed by DHR. Rather, with regard to the three youngest children, the juvenile court granted the petitions filed by Montgomery on behalf of the Board.[10] The parents have not asserted that the Board had any duty to provide services to prevent the removal of the children from their home.
Even assuming that DHR could be said to have had a duty to provide such services under the circumstances of this case, the evidence supports the juvenile court’s finding that DHR had provided such services and that they had not been successful. The evidence also indicates that employees at the youngest children’s schools also had attempted to educate the -parents regarding treating and preventing the persistent lice problem. We hold that the parents have not deiftonstrated that, given the facts of this case, the juvenile court erred in concluding that DHR met any burden it might have had to prevent the children’s removal from the home.
The parents have failed to demonstrate that the juvenile court erred in finding the three youngest children dependent and awarding custody of them to the maternal grandmother. Accordingly, we affirm the judgments pertaining to those children.
2091144 — AFFIRMED.
2091145 — AFFIRMED.
2091146 — AFFIRMED.
2091147 — AFFIRMED.
PITTMAN and THOMAS, JJ., concur.
BRYAN and MOORE, JJ., concur in the result, without writings.

. The parties refer to these orders as the “January 21, 2009, order[s],” because the juvenile court appears to have announced its ruling from the bench on that date. However, pursuant to Rule 58(c), Ala. R. Civ. P., an order or judgment is not deemed entered until it is entered in the State Judicial Information System. The juvenile court entered a pendente lite order pertaining to J.M.M. on January 21, 2009. However, it entered the pendente lite orders pertaining to the three youngest children on February 10, 2009. For ease of reference in this opinion, this court has elected to refer to the pendente lite dependency orders reached after the juvenile court’s January 21, 2009, hearing and pertaining to each of the four children as having been entered on January 21, 2009.

. It is not clear why the father did not receive custody of the four cousins as well. However, as is explained later in this opinion, the parents testified that they had been separated and living apart for approximately four years.

. J.M.M. has a cyst in his brain that has caused some health problems, and J.L.M. is legally blind. M.L.M. has asthma, but it is not clear whether the mother sought disability benefits for her based on that condition. DHR questioned whether the children actually had all the problems for which they received disability payments; specifically, DHR questioned whether the children had seizures in addition to their other health problems. DHR openly questioned the mother regarding whether she was defrauding the Social Security system by seeking disability benefits for the children. Although this issue is not pertinent to a determination of whether the children were dependent, it could have impacted the juvenile court’s perception of the mother’s credibility.

. In this opinion, this court has referred to the house purportedly occupied solely by the mother, or the mother and children, as being the parents' residence. We have made such references for the sake of expediency, and those references should not be interpreted as a resolution of the disputed factual issue of whether the parents have actually separated.

. The Board participated in the proceedings, but did not file a brief on appeal.

. In this opinion, although this court is unable to reach the merits of the appeal pertaining to J.M.M., we have discussed some facts pertaining to him. We have included those facts because they are relevant to the issue of the parents' credibility, which, as indicated earlier in this opinion, was directly challenged by DHR, and, with regard to his interaction with the twelve-year-old girl, to the parents' ability to properly supervise the children.

.The former Alabama Juvenile Justice Act, § 12-15-1 et seq., Ala.Code 1975, was repealed and replaced by the new Alabama Juvenile Justice Act ("AJJA”), § 12-15-101 et seq., Ala.Code 1975. See Act No. 2008-277, Ala. Acts 2008. The AJJA became effective January 1, 2009, and does not govern this case because the dependency petitions were filed before its effective date. Former § 12-15-65 was amended and renumbered as § 12-15-312, Ala.Code 1975, a part of the AJJA.

. The parents have not challenged the finding of truancy, and this court does not address that finding.

. Although the parents rely in their brief on appeal on § 12-15-312, Ala.Code 1975, because the former Alabama Juvenile Justice Act applies in this case, see note 7, supra, § 12-15-65, Ala.Code 1975 (amended and renumbered as § 12-15-129, Ala.Code 1975), governs this argument. That section provided, in pertinent part:
"(g) If the court enters an order removing a child from his or her home or continuing a child in a placement outside of his or her home pursuant to this title, the order shall contain as specific findings, if warranted by the evidence, all of the following:
*711 "(1) That continuing the placement of a child in his or her home would be contrary to the best interests of the child.
"(2) That reasonable efforts have been made to prevent or eliminate the need for removal of the child from his or her home, or that an emergency situation exists which requires the immediate temporary removal of the child from his or her home and that it is reasonable not to make efforts to prevent removal of the child from his or her home due to the emergency situation.
"(3) That reasonable efforts have been made or will be made to reunite the child and his or her family, or that efforts to reunite the child and his or her family have failed.
[[Image here]]
"(m) As used in this chapter, ‘reasonable efforts’ refers to efforts made to preserve and reunify families prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home, and to make it possible for a child to return safely to the child's home. In determining the reasonable efforts to be made with respect to a child, and in making such reasonable efforts, the child’s health and safety shall be the paramount concern.... ”

. The maternal grandmother filed the dependency petition pertaining to J.M.M.